IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-00323 |
| | : | |
| v. | : | |
| | : | |
| DIEGO ALEMAN-LOZANO | : | |
| | : | Judge Jennifer P. Wilson |

**MEMORANDUM**

Defendant Diego Aleman-Lozano ("Aleman-Lozano") is charged in a one-count indictment with possession of a firearm and ammunition by a prohibited person under 18 U.S.C. §922(g)(5)(B).  (Doc. 13.)  Section 922(g)(5)(B) provides that "[i]t shall be unlawful for any person who, being an alien . . . has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)))[.]"  18 U.S.C. § 922(g)(5)(B).[1]  Aleman-Lozano moved to dismiss the single-count indictment based on *New York State Rifle & Piston Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), arguing that Section 922(g)(5)(B) violates the Second Amendment to the United States Constitution.  (Doc. 41.)  For the reasons that follow, the court will deny the motion to dismiss the indictment because the

---

[1] 8 U.S.C § 1101(A)(26) provides that "[t]he term 'nonimmigrant visa' means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter."

1

Government has met its burden of showing that Section 922(g)(5)(B) is consistent with the Nation's historical tradition of firearm regulation.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Aleman-Lozano was charged by criminal complaint with one count of possessing a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(5) on September 27, 2021.  (Doc. 1.)  Aleman-Lozano appeared for an initial appearance on September 30, 2021, and was released on conditions of supervision.  (Doc. 11.)  An indictment was filed on October 27, 2021, alleging that Aleman-Lozano had been admitted to the United States under a nonimmigrant visa, and that he possessed a firearm and ammunition, specifically a "9 [millimeter] Self Made Firearm (SMF), Polymer80 Semi-Automatic Pistol, Model PF940V2 with a large capacity magazine containing 16 rounds of 9 [millimeter], and a single round of 5.56 caliber ammunition[.]"  (*Id.* at 1.)[2]

On May 23, 2023, Aleman-Lozano filed the instant motion to dismiss the single-count indictment, arguing that 18 U.S.C. § 922(g)(5)(B) is unconstitutional under the Second Amendment as interpreted by *New York State Rifle Ass'n v. Bruen*, 597 U.S. 1 (2022).  (Doc. 41.)  The Government responded on July 5, 2023.  (Doc. 47.)  Aleman-Lozano filed a reply brief on July 14, 2023.  (Doc. 48.)  Accordingly, this motion is fully briefed and ripe for review.

---

[2] For ease of reference, the court utilizes the page numbers contained in the CM/ECF header.

## DISCUSSION

### A. The Text of the Second Amendment and Significant Rulings on the Second Amendment

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.

From 1939 to 2008, the Second Amendment was interpreted in accordance with *United States v. Miller*, 307 U.S. 174 (1939).  In *Miller*, the Supreme Court focused on the history and meaning of the word "Militia" in the context of the Second Amendment.  The Court observed that the Constitution, as originally adopted, granted Congress the power "'To provide for calling forth the Militia to execute the Laws of the Union.'"  *Miller*, 307 U.S. at 178 (quoting U.S. CONST. art. 1, § 8).  The Court then held: "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." *Id.*  This Militia-based rationale for the Second Amendment held sway for 70 years.  *See United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309, at *6 (S.D. Miss. June 28, 2023) (discussing scholarly articles regarding *Miller*).

Then, in 2008 and 2010, the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010),

resulting in a significant change in our understanding of the Second Amendment. In those decisions, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8, 9. (citing *Heller*, 554 U.S. at 570; *McDonald*, 561 U.S. at 742). And then, in 2022, the Court held in *Bruen* "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id*. at 10. Following the holdings of *Heller*, *McDonald*, and *Bruen*, the Nation now understands that the Second Amendment establishes an individual right to keep and bear arms that does not depend on service in the militia.

In the years following *Heller* and *McDonald*, "the Courts of Appeals . . . coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 17. In *Bruen*, the Court rejected the two-step framework that had developed, and detailed the correct standard to be applied to Second Amendment challenges. *Id.* at 17–31. The Court explained that the correct standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's

4

>historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). The Court provided some guidance as to how courts are to assess whether a modern firearm regulation is consistent with historical tradition. The Court observed first that when analyzing a modern firearm regulation that addresses a "general societal problem that has persisted since the 18th century":

>[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 26, 27. On the other hand, when analyzing a modern firearm regulation that was "unimaginable" during the founding era, the Court instructs:

>[T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* at 28, 29 (citation omitted). In order to ascertain whether regulations are "relevantly similar," the Court notes that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's

5

right to armed self-defense." *Id.* at 29. The Court explains that the burden on the Government is to identify a "well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

### B. The Third Circuit Applies *Bruen* in *Range*

Nearly one year after *Bruen* was decided, the Third Circuit issued an *en banc* decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023). The majority opinion, authored by Judge Hardiman and joined by eight judges, holds that Bryan Range remains among "the people" protected by the Second Amendment despite his false statement conviction, and "because the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range," Section 922(g)(1) violates the Second Amendment as applied to Range.[3] *Id.* at 98.

The *Range* decision arises from a civil suit rather than a criminal prosecution. In 1995, Bryan Range pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law. He was sentenced to three years'

---

[3] Although the instant case does not involve § 922(g)(1), the *Range* court's discussion and application of *Bruen* is helpful in resolving the issue.

probation, and ordered to pay restitution, costs, and a fine.  When Range pleaded guilty, his conviction was classified as a misdemeanor punishable by up to five years' imprisonment.  That felony-equivalent conviction precludes Range from possessing a firearm pursuant to 18 U.S.C. § 922(g)(1).  After Range learned that he was barred from possessing a firearm because of his 1995 conviction, he filed a civil action seeking a declaration that Section 922(g)(1) violates the Second Amendment as applied to him and an injunction prohibiting the law's enforcement against him.  *Range*, 69 F.4th at 98–99.

The parties filed cross motions for summary judgment.  The district court granted the Government's motion, applying then-controlling Third Circuit precedent.  *Id.* at 99 (noting that the district court relied upon *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016), *Holloway v. Att'y Gen.*, 948 F.3d 164 (3d Cir. 2020), and *Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020)).  Range appealed, and while his appeal was pending, the Supreme Court decided *Bruen*.  The panel hearing Range's appeal affirmed the district court's grant of summary judgment in the Government's favor, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights." *Range*, 53 F.4th at 266.  Range then petitioned for

rehearing *en banc*, the court granted the petition, and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022).

The *en banc* majority opinion concludes by clarifying that the decision is "a narrow one" deciding the constitutionality of Section 922(g)(1) only as applied to Bryan Range based on his prior felony-equivalent false statement conviction.[4] *Range*, 69 F.4th at 106.  Because *Range* is binding precedent applying *Bruen* in the context of an as-applied challenge to Section 922(g)(1)—the same criminal statute at issue in this case, though a different subsection—it is important to understand the court's analysis and rationale.

Applying *Bruen*, the court explained that the first part of the analysis is to decide whether the text of the Second Amendment applies to the person and his proposed conduct.  As noted by the court, this determination is significant, because if the Second Amendment applies to the person and proposed conduct, then the Government bears the burden of proving that the firearms regulation at issue "'is

---

[4] Judge Ambro authored a concurring opinion to separately make the point that the success of Range's as-applied challenge "does not spell doom for § 922(g)(1)." *Range*, 69 F.4th at 109. Judge Ambro observes that Section 922(g)(1) "remains 'presumptively lawful'" because "it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society." *Id.* at 110.  Judge Ambro's review of historical analogues leads him to conclude that there is, in general, a historical tradition of stripping firearms from those who cannot be trusted with them because they pose a threat to the orderly functioning of society. *Id.* at 111–12.  Ultimately, he concurs with the majority opinion because presumptions can be rebutted, and the Government did not carry its burden of proving that Range poses a threat to the orderly functioning of society.  Accordingly, in his view, Range may not be constitutionally disarmed based on the record presented. *Id.* at 112.

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Range*, 69 F.4th at 101 (quoting *Bruen*, 597 U.S. at 19).

On the first question, the court determined that Range remains one of "the people" despite his prior conviction. *Id*. at 101–03. The court reached this conclusion for four reasons, none of which depended on the specifics of Range's conviction. First, the court noted that because the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue, the Supreme Court's references to "law-abiding, responsible citizens" were dicta that should not be construed too broadly. *Id.* at 101. Second, the court observed that other constitutional provisions, including the First and Fourth Amendments, also reference "the people," and the meaning of "the people" should not vary across provisions. *Id.* at 101–02. Third, the court agreed with the statement in *Binderup* and the logic of then-Judge Barrett in her dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), that persons with Second Amendment rights may nonetheless be denied possession of a firearm. Finally, the court noted that the phrase "law-abiding, responsible citizens" is too expansive and vague to constitute a workable standard and would, in any event, give far too much authority to legislatures to decide whom to exclude from "the people." *Id.* at 102–03.

Next, the court addressed the "easy question" of whether the Second Amendment applies to the proposed conduct. The court held that Section

922(g)(1) regulates Second Amendment conduct because Range's request to possess a rifle to hunt and a shotgun to defend himself at home are plainly within the constitutional right as defined by *Heller*.  As a result, "the Constitution presumptively protects that conduct." *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2126).

Finally, the court addressed the question of whether "the Government ha[d] justified applying Section 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2130.)  The court held that the Government did not carry its burden. *Id.*  The court addressed five discrete arguments presented by the Government, but found that none satisfied the Government's burden. *Id.* at 103–06.  Ultimately, the court determined that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106.

### C. Case Law Regarding Section 922(g)(5)(B)

There is no case law deciding whether Section 922(g)(5)(B) is consistent with the Second Amendment.  However, there is case law deciding whether

Section 922(g)(5)(A) is constitutional.[5] Prior to *Bruen*, the Fourth, Fifth, and Eighth Circuits decided that the Second Amendment does not protect unauthorized immigrants because this group is not part of the "people" protected by the Second Amendment. *See United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011).[6] The Second, Ninth, Tenth, and Eleventh Circuits have assumed that unauthorized immigrants are a part of "the people" protected by the Second Amendment, but that disarming this group of people is consistent with the nation's history and tradition. *See United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) (assuming unauthorized immigrants are part of the people but holding that § 922(g)(5) passed intermediate scrutiny);[7] *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) (same); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (did not decide whether unauthorized immigrants were protected by the Second Amendment, but held that Section 922(g)(5) was constitutional under the Second Amendment); *United States v. Jimemez-Shilon*, 34

---

[5] Section 922(g)(5)(A) makes it unlawful for any person "who, being an alien—is illegally or unlawfully in the United States."

[6] The Eighth Circuit later decided the holding in *Flores* was consistent with *Bruen* in *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023).

[7] *Bruen* did away with applying any type of means-end scrutiny to Second Amendment cases and limited the analysis to: 1) whether the plain text of the amendment covers the conduct at issue and 2) whether regulating this type of activity is consistent with the United States' history and tradition of firearm regulation. *Bruen*, 597 U.S. at 17.

F.4th 1042, 1049 (11th Cir. 2022) (assuming without deciding that unauthorized immigrants are part of the "people" but ultimately deciding that banning unauthorized immigrants from possessing firearms does not "infringe on the right the Second Amendment embodies.") The Seventh Circuit held that an unauthorized immigrant was included in the definition of "people" but that Section 922(g)(5) passed intermediate scrutiny and was, thus, constitutional. *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015). The court notes that, since *Bruen*, application of any type of means-end scrutiny test is no longer applicable. *Bruen*, 597 U.S. at 19.

A court in this district has also decided this issue. In *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022.), the Honorable Robert D. Mariani thoroughly lays out the competing arguments on the constitutionality of Section 922(g)(5)(A). Defendant DaSilva was charged in a two-count indictment with being an alien in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5) and § 924(a)(2). *Id.* at *1. He brought a motion to dismiss the indictment, arguing that Section 922(g)(5) is unconstitutional on its face because it violates the Second Amendment and that the statute is unconstitutional as applied to him in violation the Fifth and Fourteenth Amendments. *Id.* Judge Mariani analyzed whether Section 922(g)(5)(A) was constitutional under the Second Amendment, relying on the framework in *Bruen*,

12

by determining "whether the Second Amendment's plain text covers the individual's conduct at issue and, if so, whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation." *Id.* at *4.

Addressing the first issue, Judge Mariani discussed whether DaSilva was one of the "people," protected by the Second Amendment, but ultimately assumed unauthorized immigrants were part of the "people" without deciding the issue. *Id.* at 5. Judge Mariani noted that in other contexts, the "Supreme Court has suggested that 'the people' protected by the Second Amendment 'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Additionally, Judge Mariani pointed out the *Heller* and *Bruen* Courts' usage of "law-abiding" and "citizen" when discussing "the people." *Id.* However, the court ultimately did not reach a determination on the issue and moved to whether the nation's history and tradition support disarming unauthorized immigrants.

Judge Mariani then discussed the circuit decisions identified above, noting that no court has found Section 922(g)(5)(A) unconstitutional, but that the courts have reached that conclusion in varying ways. *Id.* at * 6–7. Next, Judge Mariani discussed the extensive discussion of the nation's history and tradition regarding

13

arming aliens or immigrants set forth in *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022). *See DaSilva*, 2022 WL 17252870 at * 7, 8. In *Jimenez-Shilon*, the Eleventh Circuit noted that, in the laws of England prior to the founding era, the right to bear arms was limited to "subjects," and that it had "found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects) . . . Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry." *Jimenez-Shilon*, 34 F.4th at 1046 (citing Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015)). The court then explained that this view persisted in the colonies, with "several colonies enact[ing] 'complete bans on gun ownership' by slaves and Native Americans[,]" as well as some "white aliens, who weren't members of the polity." *Id.* 1047–48 (citing Adam Winkler, Heller's *Catch-22*, 56 UCLA L. REV. 1551, 1562 (2009); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998)). Additionally, "an individual's undivided allegiance to the sovereign— his membership in the political community—was regarded as a precondition to the right to keep and bear arms." *Id.* at 1048 (quotation marks omitted). The court concluded that "[b]y refusing to take an oath of allegiance to the state, those

associated with foreign governments renounced their membership in the American political community and, in doing so, forfeited the state's protection of their right to arms—even if they continued to live on American soil[,]" and that the Second Amendment was intended to codify this view. *Id.* at 1048, 1049.

Judge Mariani incorporated this reasoning in his decision in *DaSilva*, and synthesizing the other sources discussed, ultimately concluded that:

> The rights of those who lack an undivided allegiance to the United States, and thus do not owe or have sworn such an allegiance and are outside of the membership of the political community, as well as those individuals who are considered "unvirtuous", have been circumscribed since the Founding Era of this country. Illegal aliens, by definition only, may be considered to lack undivided allegiance to this Nation as well as to be unvirtuous (in so far as they have entered the United States in violation of the Nation's laws).

*DaSilva*, 2022 WL 17242870, at *10.

### D. The Parties' Arguments

Regarding the first step of the *Bruen* test, Aleman-Lozano argues that authorized noncitizens (i.e. those who have been issued a nonimmigrant visa) are part of the "people" because they are part of the national community or have sufficient ties to this country. (Doc. 42, p. 5) (citing *Heller*, 554 U.S. at 580–81). First, Aleman-Lozano distinguishes the cases limiting "the people" to "law-abiding citizens" as dicta after *Bruen*. (*Id.* at 6, 7.) Second, he argues that the only other right that noncitizens are prevented from exercising in the Constitution is holding public office, thus, supporting their inclusion as part of the "national community."

15

(*Id.* at 8, 9.)  Finally, Aleman-Lozano distinguishes the cases discussing unauthorized immigrants and Section 922(g)(5)(A) as inapplicable because those decisions rely on the reasoning that unauthorized immigrants are not a part of the national community because they are present in this country contrary to law.  (*Id.* at 8.)  He argues that this rationale is not applicable to authorized immigrants because they have followed the laws of this country in being present here.  (*Id.*)  The Government argues that this court should treat authorized and unauthorized citizens similarly.  (Doc. 47, p. 18.)  Moreover, the Government relies on the list of similar constitutional provisions provide by *Range*,[8] and notes that these provisions have never been specifically applied to non-citizens.  (*Id.* at 15–17.)

Turning next to the history and tradition analysis, Aleman-Lozano argues that statutes limiting gun ownership based on immigration status were not common until the early twentieth century, and this shows a lack of consistency with the nation's history and tradition.  (Doc. 46, p. 9.)  Aleman-Lozano points to the fact that aliens permitted to settle in the country had many of the same rights as citizens.  (*Id.* at 10.)

The Government contends that Section 922(g)(5)(B) is consistent with the history and tradition of this country, specifically relying upon the historical

---

[8] These provisions address who may vote for Congress, who has the right to assemble and petition the government, and who is protected against unreasonable searches and seizures.  (*Id.* at 15) (citing *Range*, 69 F.4th at 101–02.)

16

analysis provided by *Jimenez-Shilon*, 34 F.4th at 1047–48. (Doc. 47, pp. 22–26.) The Government points to the English Bill of Rights, which limited the right to bear arms to "subjects." (*Id.* at 22.) Next, the Government points to the colonial era, which gave many rights to "aliens," but limited gun ownership to "members of the polity." (*Id.* at 22, 23.) The Government also argues that "colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the citizenry who swore allegiance to the United States." (*Id.* at 24.) The Government also argues that state constitutions at the time of the founding "'continued a similar practice by restricting the right to keep and bear arms to citizens.'" (*Id.* at 24) (citing *Perez*, 6 F.4th at 462–63.)) Finally, the Government argues "the Second Amendment is connected to the concept of a 'well-organized militia'[,]" which was limited to citizens. (*Id.* at 26.)

### E. Section 922(g)(5)(B) is Constitutional Under the Second Amendment

Under the first step of the *Bruen* analysis, the court will not decide whether authorized immigrants, as described in Section 922(g)(5)(B), are covered by the Second Amendment, because the court ultimately concludes that prohibiting the possession of firearms for this group of people is consistent with the history and tradition of this nation. *See DaSilva*, 2022 WL 17242870, at * 5; *see also United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021); *United States v. Torres*, 922 F.3d 1252, 1257 (9th Cir. 2019); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169

(10th Cir. 2012); *Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022); *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015).

Under the second step of the *Bruen* analysis, the court adopts the reasoning of both *DaSilva* and *Jimenez-Shilon*, specifically finding that the Government has shown a history and tradition in this country of disarming those who have not sworn allegiance to the United States. *See Jimenez-Shilon*, 34 F.4th at 104748. As noted by Judge Mariani:

> The rights of those who lack an undivided allegiance to the United States, and thus do not owe or have [not] sworn such an allegiance and are outside of the membership of the political community, as well as those individuals who are considered "unvirtuous", have been circumscribed since the Founding Era of this country. Illegal aliens, by definition only, may be considered to lack undivided allegiance to this Nation as well as to be unvirtuous (in so far as they have entered the United States in violation of the Nation's laws).

*DaSilva*, 2022 WL 17242870, at *10. While authorized immigrants are not "unvirtuous" because they have not violated this country's immigration laws, they still remain outside of the political community. The individuals covered by Section 922(g)(5)(B) are, by definition, citizens of another country and are not present in this country with the intention of immigrating to this country. 8 U.S.C. § 1101(26) (defining "nonimmigrant visas" as "a visa properly issued to an alien as an eligible nonimmigrant[.]") The history provided by the Government is relevantly similar to the current statute, which disarms those who are in this country either unlawfully or on a non-immigrant visa, because they are neither

citizens nor have they taken an oath of allegiance to this country. Accordingly, Section 922(g)(5)(B) does not violate the Second Amendment, and Aleman-Lozano's motion to dismiss will be denied.

## CONCLUSION

For the foregoing reasons, Aleman-Lozano's motion to dismiss will be denied. An appropriate Order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: April 17, 2024